**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**The METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, Defendant-Appellee.**

No. 85–6032.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 11, 1986.
Decided Jan. 12, 1987.

Edward J. Snyder, Richard A. Correa, Tax Div., Dept. of Justice, Washington, D.C., Michael L. Paup, Glenn L. Archer, Jr., Joe B. Brown, U.S. Atty., Nashville, Tenn.,

Robert M. Olsen, Washington, D.C., Michael L. Paup, Ann Belanger Durney, David L. Pincus (argued), for plaintiff-appellant.

Kevin S. Key (argued), Nashville, Tenn., for defendant-appellee.

Before KENNEDY and NORRIS, Circuit Judges, and CONTIE, Senior Circuit Judge.

CORNELIA G. KENNEDY, Circuit Judge.

Plaintiff-appellant United States of America appeals the judgment of the United States District Court for the Middle District of Tennessee for defendant-appellee The Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro") in this action for the refund of certain real property taxes. The issue presented for review is whether the District Court erred in holding that the J.W. Bateson Company ("Bateson"), a federal government contractor, has a valuable leasehold interest subject to local real property taxation in land owned by the United States. We hold that, assuming such a leasehold interest exists, it has no value. Thus, we reverse the judgment of the District Court.

## I.

On October 11, 1972, the United States entered into a "Contract to Finance, Construct and Sell" with Bateson for the construction and financing of a Federal Building annex, a parking garage, and a connecting pedestrian tunnel ("the improvements") on land owned by the United States in fee simple in downtown Nashville, Tennessee. The contract required Bateson to finance and construct the improvements and to sell them to the United States pursuant to the terms of a purchase contract to be entered into by the parties. The United States agreed to grant Bateson a 45-year lease of the land on which the improvements were to be constructed. Bateson was to pay the applicable real estate taxes during the two-year construction period

(with government-provided funds) and the United States was to pay the taxes thereafter. The United States received the right to contest the amount or validity of any real estate taxes. The contract also provided that title to the improvements would remain in Bateson until it passed to the United States as provided for in the purchase contract and that Bateson could, with government approval, convey to a trustee (apparently for secondary financing purposes) its title to the improvements and its leasehold in the underlying land.

At the same time this contract was executed, the United States and Bateson entered into a "Ground Lease" of the underlying land. The lease provides for a term of 45 years or until the expiration of the term of the subsequent purchase contract, whichever is shorter. (Thus, the lease term is actually 30 years.) Bateson's rent for the entire term is $1. Although Bateson is to have quiet enjoyment, the lease grants the United States the right to occupy the land and the improvements once the parties entered into a purchase contract. The lease also contains the United States' assent to Bateson's mortgaging of the leasehold interest. Article 7 states that the lease is

> solely for the purpose of securing the Government's obligations under the said Contract to Finance, Construct and Sell, and that the Contractor shall have no rights under said Lease to erect or demolish improvements on the Site, except as provided for in said Contract to Finance, Construct and Sell, or to sublease or assign all or any part of said leasehold interest except as provided in Title IV, Article 2, of said Contract to Finance, Construct and Sell.

Joint Appendix at 45.

On July 8, 1974, the improvements were sufficiently completed so that the parties entered into a "Purchase Contract." This contract provides for a purchase price of $13,804,808.57, and an annual interest rate of 7.75% over the 30-year term of the contract. Thus, the semiannual payments due under the contract are $595,812.52.

The United States agreed to pay all real estate taxes on the improvements and received the right to contest the amount or validity of such taxes. Title is to vest automatically in the United States upon expiration of the term, and Bateson agreed to deliver a deed for the improvements and to release its leasehold interest in the land at that time. The United States received the right to make alterations and improvements and accepted sole responsibility for the condition, maintenance, and management of the land and its improvements during the 30-year term.

On July 8, 1974, the United States also issued a Certificate of Contract Obligation evidencing its obligation to make semiannual payments to Bateson of $595,812.52 for the improvements built pursuant to the Contract to Finance, Construct and Sell. On the same date, Bateson, with the approval of the United States, assigned title to the improvements, its rights in the Ground Lease, and the amounts to be paid under the Purchase Contract to the First National Bank of St. Paul, Minnesota.

In 1975, Metro appraised the improvements at $9,707,000. The United States paid and continues to pay the real estate taxes assessed against the improvements. That assessment and those taxes are not at issue here.

Metro also appraised the Bateson leasehold in 1975 at $548,000. Metro's appraiser theorized that a 45-year lease of land at a rental of $1 is the equivalent of fee simple ownership of the land. Thus, the appraiser allocated all of the land's value to the lease and none to the underlying fee interest.

Bateson was charged a total of $110,674.08 in real property taxes for the leasehold from 1975 through 1982. In accordance with its contractual obligations, the United States paid these taxes. The payments for 1975 through 1979 were made without protest; the payments for 1980 through 1982 were made under protest.

In June, 1982, the United States filed this suit. The United States claimed that Bateson does not actually have a leasehold interest in the land, but rather has a nontaxa-

ble security interest. Alternatively, the United States argued that if Bateson does have a leasehold interest in the land, that interest has no value. The United States requested a refund of all the taxes paid in connection with the leasehold and a declaratory judgment that the land is immune from real property taxation.

The District Court held that, under 40 U.S.C. § 602a(d), Metro could legally tax the Bateson leasehold until title to the property reverts to the United States (i.e., until the end of the 30–year term). The Court found that "the Bateson leasehold has a present value of $595,812.52 semi-annually [the amount of the semiannual payments for the purchase of the improvements] and that this leasehold is subject to the taxing power of Metro." Joint Appendix at 93.[1]

The United States filed a motion to alter or amend the District Court's memorandum and order; the District Court denied the motion without comment. This appeal followed.

## II.

■ Taxation of United States property by states or their political subdivisions violates the Supremacy Clause of the United States Constitution. *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). In 40 U.S.C. § 602a(d), however, Congress waived the federal government's tax immunity with regard to purchase contracts entered into by the General Service Administration:

With respect to any interest in real property acquired under the provisions of this section, the same shall be subject to State and local taxes until title to the same shall pass to the Government of the United States.

40 U.S.C. § 602a(d). The United States does not dispute that the improvements are subject to taxation by Metro under section 602a(d) until title passes to the government. Nor does the United States dispute that if Bateson has a valuable leasehold in the underlying land, the doctrine of intergovernmental immunity would not preclude Metro from imposing a nondiscriminatory tax on that leasehold. *See United States v. County of Fresno,* 429 U.S. 452, 462, 97 S.Ct. 699, 704–05, 50 L.Ed.2d 683 (1977) ("[A] State may, in effect, raise revenues on the basis of property owned by the United States as long as that property is being used by a private citizen or corporation and so long as it is the possession or use by the private citizen that is being taxed.").

However, the United States contends that there is no taxable leasehold here. The United States argues that the rights granted to Bateson by the agreements entered into between the parties do not rise to the level of a leasehold, but instead evidence the creation of a mere security interest, which would not be subject to taxation. The District Court did not address this contention. Rather, it simply found that a leasehold exists and then valued that interest.

We also assume for the purposes of this opinion that a valid leasehold exists. However, we find that that leasehold interest has no value.

■ Under Tennessee law, a leasehold is considered real property and is taxable as such. *See* Tenn.Code Ann. § 67–5–502(6) (1983).[2] A leasehold, like any other proper-

---

1. The District Court also held that Metro could tax the United States only for the land actually leased by the United States to Bateson, as described in the 1974 Amendment to the Ground Lease. Thus, the District Court found that Metro could tax the Bateson leasehold for approximately 12,563.76 square feet, rather than the 27,531 square feet that it had been using as a base figure for determining the tax assessment. The parties do not address this holding on appeal.

2. This section provides:

**Place and function of assessment.**—The function of assessment shall be as follows, to wit:

. . . .

(6) All mineral interests and all other interests of whatsoever character, not defined as products of the soil, in real property, including the interest which the lessee may have in and to the improvements erected upon land where the fee, reversion, or remainder therein

ty, is to be valued at "its sound, intrinsic and immediate value, for purposes of sale between a willing seller and a willing buyer without consideration of speculative values...." Tenn.Code Ann. § 67–5–601(a) (1983). Thus, restrictions on the owner's rights in real property must be taken into account in appraising that property. *See* Tenn.Code Ann. § 67–5–602 (1983).[3] Under section 67–5–602(b), restrictions and encumbrances that run with the land, as opposed to those that are personal to the parties in possession, affect the value of the estate for tax purposes. *Cf. Hoover v. State Bd. of Equalization,* 579 S.W.2d 192, 196 (Tenn.App.1978) (construing earlier version of Tenn.Code Ann. § 67–5–602(b)).

The District Court acknowledged that the restrictions on the Bateson leasehold run with the land and thus affect the value of the leasehold for tax purposes. Moreover, the District Court found that the restrictions deprived Bateson of the usual valuable rights of a lessee:

> Under the terms of the lease, the United States has the right of reversion, the sole and exclusive right of possession and use of the property, the right to make alterations, additions, or improvements, and the responsibility for maintenance and management of the property.

Joint Appendix at 88. Bateson, on the other hand,

has no right to use or occupy the property, no right to sell or sublease, and no right to assign the lease without the permission of the United States. Bateson's complete rights in leasehold [sic] vest only if the United States defaults on the purchase contract payments.

*Id.*

Each party had an expert testify at the trial. The United States' expert, Walter Keuhnle, found the leasehold had no value because the United States has the rights of fee ownership as well as the rights of use, possession, and reversion, subject only to its obligation to make payments under the Purchase Contract. Bateson, on the other hand, has no rights in the leasehold unless the United States defaults on those payments. Thus, Keuhnle concluded that

> the leasehold interest of Bateson in the site is nominal and without sound, intrinsic or immediate market value because the United States has retained all the rights of use of the property during the lease term leaving the lessee, Bateson, with only a naked title for the purpose of securing the obligation of the United States under the purchase money contract.

Joint Appendix at 107.

Metro's witness, Robert McDaniels, testified that the land and improvements could be appraised only as a unit, not separately. He stated that Bateson was, in effect, the

---

is exempt to the owner, and which said interest or interests is or are owned separate from the general freehold, shall be assessed to the owner thereof, separately from the other interests in such real estate, which other interests shall be assessed to the owner thereof, all of which shall be assessed as real property. Tenn.Code Ann. § 67–5–502(6) (1983).

**3.** This section provides in pertinent part:
 **Assessment guided by manuals—Factors for consideration.—**(a) In determining the value of all property of every kind, the assessor shall be guided by, and follow the instructions, of the appropriate assessment manuals issued by the state division of property assessments and approved by the state board of equalization.
 (b) For determining the value of real property, such manuals shall provide for consideration of the following factors:

 (1) Location;
 (2) Current use;
 (3) Whether income bearing or nonincome bearing;
 (4) Zoning restrictions on use;
 (5) *Legal restrictions on use;*
 (6) Availability of water, electricity, gas, sewers, street lighting, and other municipal services;
 (7) Natural productivity of the soil. except that the value of growing crops shall not be added to the value of the land; and
 (8) *All other factors and evidences of values generally recognized by appraisers as bearing on the sound, intrinsic and immediate economic value at the time of assessment.*
 Tenn.Code Ann. § 67–5–602 (1983) (emphasis added).

*lessor* of a lease-back of the land and improvements to the United States. Thus, he treated the semiannual payments of $595,-812.52 made by the United States to Bateson under the Purchase Contract as rent to Bateson. He found the value of this semiannual "rent" at 7.75 percent interest over the next 30 years to have a present value of approximately $13,805,000. He found the United States' reversionary interest in the buildings at the end of 30 years, assuming that the buildings have a 60–year economic life, to be approximately $735,000. McDaniels thus valued the land and improvements together at $14,500,000. He allocated $13,805,000 to Bateson and $735,-000 to the United States.

The District Court seemingly adopted the testimony of Metro's expert and concluded that the leasehold "has a present value of $595,812.52 semi-annually," Joint Appendix at 93, and that the leasehold is subject to the taxing power of Metro until title to the property reverts to the United States.[4]

■ We find the District Court's determination that the leasehold has value to be clearly erroneous. First, it appears that under Tennessee law the land and the improvements can be valued separately. *Cf. Metropolitan Gov't of Nashville & Davidson County v. Schatten Cypress Co.*, 530 S.W.2d 277, 281 (Tenn.1975) ("As was entirely appropriate, the Assessor separated his valuation of the leasehold in the land from that of the buildings."). Indeed, Metro consistently had been valuing them separately. Second, the semiannual payments of $595,812.52 made by the United States to Bateson are payments owed for the improvements under the Purchase Contract. These payments are in no way linked to the leasehold interest.[5] Were the leasehold to be transferred to a third party or to cease

to exist, the United States' obligation to make those payments to Bateson would not change. Thus, we see no grounds for attributing part or all of these payments to the leasehold.

■ Finally, we agree with the United States' expert that the leasehold itself has no "sound, intrinsic or immediate market value." The *State of Tennessee Assessment Manual* (1972) defines the lessor's interest in a leased fee estate as "consisting of the right to receive the contract rent provided by the lease, the reversion of the property at the end of the lease, *plus any other benefits,* but minus any penalties according to the provisions of the lease." *Id.* at AP–172 (emphasis added). The lessee's interest in the leasehold estate, on the other hand, is equal to "the difference between total value of the property, and the lessor's interest." *Id.* at AP–173. Here, the lessor's rights are so complete as to encompass virtually the entire estate. Indeed, the only value that the leasehold has is to secure the interest of the owner of the improvements in those improvements until the United States has fulfilled its obligations under the Purchase Contract.

As stated earlier, Tenn. Code Ann. § 67–5–601(a) (1983) provides that a leasehold should be valued at the price that a willing buyer would pay a willing seller. As the United States' expert witness testified, the rights of Bateson or its assignee vest only if the United States defaults on its obligations under the Purchase Contract, and "[t]he unlikely chance of default by the United States is made even more remote by the Certificate of Contract Obligation which specifically obligates the United States to make the purchase contract payments." Joint Appendix at 106. Since

---

4. The United States contends that the District Court allocated the entire $13,805,000 figure to the leasehold alone, even though McDaniels had assigned that value to the leasehold and the improvements together. Since the United States has never disputed that the improvements are subject to taxation, it contends that the District Court's allocation could result in double taxation. Metro conceded at oral argument that were Metro to value the leasehold at $13,805,000

and continue to tax the improvements in accordance with past practice, impermissible double taxation would arise.

5. The District Court erroneously stated that Bateson had the right to receive $595,812.52 semiannually under the *Ground Lease;* actually, Bateson had the right to receive this amount under the *Purchase Contract.*

Bateson has no right to the economic rental value of the land, the market value of its leasehold interest is, as the expert noted, zero.

### III.

Accordingly, the judgment of the District Court is REVERSED and the action is RE-MANDED to the District Court for entry of a judgment in accordance with this opinion.